**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| PATRICK INSCHO, STEVEN PIKE, | : | |
| DONNA FIRKIN, DIANNE TURNER, and | : | Civil Case No. _____ |
| LORETTA BRICKEY, *on behalf of themselves* | : | |
| *and all individuals similarly situated*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID JOHNSON, KIRK CHEWNING, and | : | |
| CANE BAY PARTNERS, VI, LLLP, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## CLASS ACTION COMPLAINT

Plaintiffs, Patrick Inscho, Steven Pike, Donna Firkin, Dianne Turner, and Loretta Brickey (collectively "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.      Like many other states, Virginia enacted usury laws that prohibit companies from making high interest loans. The prohibition against the making of unethical monetary loans is not a modern principle; indeed, "[f]or nearly three-hundred years, American states were nearly unanimous in their prohibition of usurious lending through double—or even single-digit interest rate caps." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012). With roots as ancient as the Bible, usury laws reflect society's *longstanding* view that it is unethical and, thus, illegal to charge excessive interest rates—a view hammered home by a variety of jurisdictions who have criminalized this conduct, including Virginia. Va. Code § 6.2-1540 (making it a class 2

misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); *see also* Peterson, *supra*, at 896, 899; Robin A. Morris, *Consumer Debt and Usury: A New Rationale for Usury*, 15 Pepp. L. Rev. 151, 151 (1988) (explaining that usury laws are "society's oldest continuous form of commercial regulation").

2.      This case involves a criminal enterprise that was established with the intent of evading state usury laws. In an apparent attempt to insulate themselves from any legal liability, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a payday lending scheme associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe.

3.      To facilitate their blatant violations of state lending laws, Defendants created a network of payday lending websites, which claimed to be owned and operated by the Mandan, Hidatsa, and Arikara Nation (the "MHA Nation")—three affiliated Native American tribes located on the Fort Berthold Reservation in North Dakota. Under the rent-a-tribe model, Defendants were permitted to use the tribes as a front in exchange for a nominal fee. Upon information and belief, the benefit to the tribes was nominal, while Defendants pocketed exorbitant profits. *See* Zeke Faux, *Payday Lenders at Play on Caribbean Yachts: A Crackdown by States Sends Business Online*, Bloomberg (Sept. 11, 2014), https://www.bloomberg.com/news/articles/2014-09-11/online-payday-lenders-sidestep-state-laws-for-billions-in-profit.

4.      Plaintiffs seek a declaratory judgment that the loan agreements related to Defendants' rent-a-tribe scheme are void and unenforceable. Defendants' usurious loans were void *ab initio* pursuant to Va. Code. § 6.2-1541(A), which provides that any loan containing an interest rate above 12% "shall be void."[1] Plaintiffs further seek a declaratory judgment that the choice of

---

[1] *Rahmani v. Resorts Intern. Hotel, Inc.*, 20 F. Supp. 2d 932, 935 (E.D. Va. 1998) (Ellis, J.) (explaining that a gambling contract "is void under Virginia law, it is a complete legal nullity, one that has no legal force or binding effect"); *see*

law and arbitration provisions are unenforceable as a matter of public policy because these provisions seek to disclaim all federal and state laws.[2]

5.      Additionally, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), which prohibits a person associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through "collection of unlawful debt." 18 U.S.C. § 1962(c). Defendants conspired with each other to repeatedly violate state lending statutes resulting in the collection of "unlawful debt," which RICO defines as "money or a thing of value at a rate usurious under State or Federal Law, where the usurious rate is at least twice the enforceable rate." 15 U.S.C. § 1962(6). As a result of their participation in the enterprise and the collection of interest as high as *50 times* the enforceable rate, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

6.      Plaintiffs also assert a class claim for violations of Virginia's usury laws and seek to disgorge all amounts paid by Virginia consumers in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action, their attorneys' fees, and costs. Va. Code § 6.2-305(A).

---

Black's Law Dictionary 763 (3rd Ed. 2006) (defining void *ab initio* as "[n]ull from the beginning, as from the first moment when a contract is entered into").

[2] On two recent occasions, the Fourth Circuit held that similar provisions were unenforceable for violating public policy. *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("We hold that the above provisions . . . are not distinguishable in substance from the related provisions . . . we held unenforceable in *Hayes*. The arbitration agreement in this case implicitly accomplishes what the Western Sky Agreement explicated stated, namely, that the arbitrator shall allow for the application of any law other than tribal law. Just as we did in *Hayes*, we interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.").

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

9.      Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

10.     Plaintiff   Steven Pike ("Pike") is a natural person and resident of the Commonwealth of Virginia.

11.     Plaintiff Donna Firkin ("Firkin") is a natural person and resident of the Commonwealth of Virginia.

12.     Plaintiff Dianne Turner ("Turner") is a natural person and resident of the Commonwealth of Virginia.

13.     Plaintiff Loretta Brickey ("Brickey") is a natural person and a former resident of the Commonwealth of Virginia.

14.     Defendant David Johnson ("Johnson") is a natural person and resident of the United States Virgin Islands. Johnson is the co-founder and co-chief executive officer of Cane Bay Partners IV, LLLP ("Cane Bay Partners").[3]

---

[3] Cane Bay Partners, David Johnson, http://www.canebayvi.com/david-johnson-cane-bay-partners/ (last visited May 23, 2017).

15.     Defendant Kirk Chewning ("Chewning") is a natural person and resident of the United States Virgin Islands. Along with Johnson, Chewning is the co-founder and co-chief executive officer of Cane Bay Partners.[4]

16.     Defendant Cane Bay Partners is a limited partnership organized under the laws of the U.S. Virgin Islands with a principal place of business at 2205 Church Street, Christiansted, VI 00820. Johnson and Chewning created Cane Bay Partners to make the usurious loans to Virginia consumers. Cane Bay Partners was the actual entity that procured the investment capital and performed the application processing, underwriting, and collections of the usurious loans challenged by this Complaint. Cane Bay also hired and compensated the employees who were necessary to operate the rent-a-tribe scheme.

## FACTUAL BACKGROUND

**A.     Virginia's Longstanding Public Policy Prohibiting Usurious Loans.**

17.     Like many other states, Virginia has enacted usury laws that prohibit companies from making high interest loans. *See* Va. Code § 6.2-1501(A) (providing that "[n]o person shall engage in the business of making loans to individuals for personal, family, household, or other nonbusiness purposes" and that, "in connection with any loan," no person shall charge interest "greater than the interest permitted by § 6.2-303" unless the person obtains a license from the Commission).

18.     Indeed, it is well established that Virginia's usury laws "are founded upon considerations of public policy." *Town of Danville v. Pace*, 66 Va. 1, 19 (1874). Even in an era where "state-by-state lobbying campaigns" have persuaded state legislators to reverse "nearly three hundred years" of prohibitions against "double- or even single-digit interest rate caps,"

---

[4] Cane Bay Partners, Kirk Chewning, http://www.canebayvi.com/kirk-chewning-cane-bay-partners/ (last visited May 23, 2017).

Virginia has remained committed to its longstanding view that it is contrary to public policy to charge excessive interest rates to Virginians. Peterson, *supra* ¶ 1, at 896.

19.     In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

20.     The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants. Virginia's licensing requirements include physical presence in the commonwealth and a minimum amount of liquid assets. Va. Code § 6.2-1507(A)(2). Additionally, before granting a license, the Commission must make specific findings concerning the applicant lender such as the character and fitness of the applicant and the applicant's knowledge of applicable Virginia laws and regulations. Va. Code § 6.2-1507.

21.     Over the last decade, businesses have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

**B.     Defendants Established an Enterprise to Evade Virginia's Licensing Requirements and Usury Laws.**

22.     Rather than complying with Virginia's licensing requirements and usury laws, Defendants established a rent-a-tribe business model, associating themselves with the Mandan, Hidatsa, and Arikara Nation (the "MHA Nation"), which are three affiliated Native American tribes located on the Fort Berthold Reservation in North Dakota.

23.     Upon information and belief, Defendants pay the MHA Nation a nominal fee in exchange for their affiliation with the MHA Nation.

24.     Although the MHA Nation holds itself out as the actual lender of the internet payday loans made by Defendants, MHA Nation is merely a front for Defendants' business, which is primarily operated through Cane Bay Partners.

25.     Defendant Cane Bay Partners was established by Defendant Johnson and Defendant Chewning in 2009. Together, Defendants worked for the common purpose of making and collecting the usurious loans.

26.     Defendants were a part of an enterprise that came together for the common purpose of evading state usury laws, including Virginia's licensing requirements and usury laws (the "Enterprise"). *See* 18 U.S.C. § 1691(4) (defining "enterprise"); *States v Turkette*, 452 U.S. 576, 583 (1981) (defining an association-in-fact enterprise).

27.     Johnson and Chewning brought extensive expertise to the Enterprise from their experience as consultants to pay-day lending companies. Prior to forming Cane Bay Partners, Johnson and Chewning were high-level executives with TranDotCom, which specialized in providing "software solutions" and "operating models" for companies that offered high interest loans in the form short-term loans, title loans, and lines of credit.[5]

28.     As part of its services, TranDotCom provided its customers with all of the services necessary to establish a startup finance company, including "the industry's most flexible webservices," "[u]nique replicated database option providing real-time data access for analysis,"

---

[5] TranDotCom, *About Us*, http://www.trandotcom.com/our-company.aspx (last visited May 24, 2017).

"[i]ndustry-leading consumer training focusing on best practices," and "[t]he broadest customer base ranging from singular online & storefront lenders to public companies."[6]

29.     TranDotCom's services provided "model flexibility," including software designed for "tribal lending model" and "international/offshore lending model."[7]

30.     Recognizing their customers were making millions off their advice and services, Johnson and Chewning left TranDotCom in 2008 to start Cane Bay Partners.

31.     Through the knowledge, experience, and connections made at TranDotCom, Johnson and Chewning developed the strategy and role for the nationwide scheme to make and collect small-dollar loans that state usury laws rendered wholly or partially void or uncollectible, including in Virginia.

32.     In an attempt to evade state usury laws, Johnson and Chewning adopted the tribal lending model for their business and teamed up with members of the MHA Nation.

33.     Defendants created a network of payday lending websites, which claimed to be owned and operated by the MHA Nation rather than by Defendants.

34.     The MHA Nation allowed Defendants to use its name on at least 5 internet payday lending websites, including CashJar.com, CashYes.com, CoverMeCash.com, SovereignAdvance.com, and MaxLend.com (collectively "Defendants' Payday Lending Companies").

35.     Defendants no longer use CashJar.com, CashYes.com, or CoverMeCash.com, which Defendants shut down after receiving cease and desist letters from various state regulators. *See* Faux, *supra* at ¶ 3.

---

[6] TranDotCom, *Taking the First Step: Choosing Short-Term Lending Software Solution*, http://www.trandot-com.com/our-solutions/loan-management-systems.aspx (last visited May 24, 2017).
[7] *Id.*

36.    Although the MHA Nation holds itself out as the actual lender of the internet payday loans initiated by Defendants' Payday Lending Companies, Cane Bay Partners performed the underwriting requirements, funded the loans, and controlled all aspects of the servicing after the initiation of the loan.

37.    To disguise Defendants' involvement in the Enterprise, Defendants' Payday Lending Companies made a series of misrepresentations in their loan agreements and communications with consumers.

38.    For example, MaxLend advertises that it is "wholly owned" and controlled by the MHA Nation; that its website "is owned and operated" by the MHA Nation; and that its "loan products are provided by a sovereign government" and its business proceeds "fund governmental services for Tribe citizens."[8]

39.    Similarly, Sovereign Advance claims that it is "owned" by the MHA Nation and operates within the Fort Berthold Reservation.[9]

40.    None of these representations are true—each of the websites are controlled by Johnson and Chewning who reap nearly all of the proceeds from the unlawful loans. *See, e.g.*, John McCartney, *Loan Sharking Business Gives St. Criox, Cane Bay, A Black Eye in the National Media, Virgin Islands Free Press* (Sept. 6, 2015), http://vifree-press.com/2015/09/loan-sharking-business-gives-st-croix-cane-bay-a-black-eye-in-the-national-media/.

41.    Upon information and belief, the MHA Nation does not participate in the day-to-day operations of the payday lending websites and does not perform any of the work in originating,

---

[8] Max Lend, *Home*, https://www.maxlend.com/ (last visited May 24, 2017).

[9] Sovereign Advance, *Terms*, https://www.sovereignadvance.com/Terms.aspx (last visited May 24, 2017).

underwriting, or financing the loans. The MHA Nation also does not handle the servicing of or collection of the illegal loans.

42.     Instead, Cane Bay Partners "registers the domains, designs the sites, approves the loans, and analyzes the returns," according to its former employees. *Id.*

43.     According to its ex-employees, Cane Bay Partners has "no other business other than running the payday-loan websites, and Johnson and Chewning directed operations for all of them," including collection of each loan. *Id.*

44.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Johnson and Chewning and had no connection to the MHA Nation or the Fort Berthold Reservation.

45.     During the pertinent times, Johnson and Chewning were the architects of the lending scheme described herein, participated in the day-to-day operations of the scheme, controlled the businesses, and personally received the proceeds, including proceeds from loans made to Virginia consumers.

46.     Since the inception of Cane Bay Partners in 2009, Johnson and Chewning directly and actively managed the activities of Cane Bay Partners.

47.     Johnson and Chewning formed and used the companies associated with the Enterprise, including Cay Bay Partners, to engage in unfair, deceptive, and abusive acts that harmed Plaintiffs and the class members.

48.     As a result of their participation in the Enterprise and direct involvement of the underlying illegal conduct, Johnson and Chewning are jointly and severally liable for the claims stated in this Complaint.

**C.     Defendants' Made Loans to Virginia Consumers Charging Interest in Excess of 12% APR.**

49.     Defendants marketed, initiated, and collected usurious loans in Virginia. Johnson and Chewning chose Virginia as a place where loans and collection efforts would ensue, and they participated in and knew of the actions of Cay Bay Partners in Virginia.

50.     Johnson and Chewning knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Cane Bay Partners.

51.     In order to qualify for Defendants' loan product, consumers were required to electronically sign a form contract created by Defendants—not created by the MHA Nation.

52.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

53.     For example, Defendants charged Mr. Inscho with an APR of 648%—more than 50 times the 12% interest cap in Virginia for companies that are not licensed by the Commision. Va. Code § 6.2-303(A).

54.     Similarly, Defendants charged Mr. Pike with an APR of 536%.

55.     Neither Defendants nor their Payday Lending Websites had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to Plaintiffs; nor did they ever attempted to obtain such a license. *See* Va. Code § 6.2-1501. The MHA Nation also did not have a consumer finance license in Virginia.

56.     Accordingly, Defendants' loans were null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

57.     Defendants received at least $5,054.25 from Pike as a result of Defendants' illegal loans—most of which Defendants credited as payment for interest or other fees.

58.     Defendants received at least $13,325 from Firkin as a result of Defendants' illegal loans—most of which Defendants credited as payment for interest or other fees.

59.     Defendants received at least $831 from Turner as a result of Defendants' illegal loans—most of which Defendants credited as payment for interest or other fees.

60.     Defendants received at least $288.30 from Inscho as a result of Defendants' illegal loans—most of which Defendants credited as payment for interest or other fees.

61.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c); *see also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.").

62.     As a result of Defendants' conduct, including participation in the Enterprise, Defendants are liable to Plaintiffs and the class for twice the total amount of interest paid on the usurious loans pursuant to Va. Code § 6.2-305(A), and Defendants are also jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## D.     Defendants' Loan Agreements Are Void and Unenforceable Under Virginia Law.

63.     Because the loans were made without a consumer finance license and used an annual APR in excess of 12%, the agreements were void *ab initio* under Virginia law. Va. Code. § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

64.     Defendants' loan agreements not only violate Virginia's public policy against usurious loans as codified in Va. Code § 6.2-1541(A), but they also contain unconscionable choice

of law and arbitration provisions that seek to disclaim all federal and state laws in favor of tribal law.

66.     For example, the Loan Agreement Defendants provided to Mr. Pike disclaims the application of any state or federal law to the agreement other than the law of the MHA Nation, stating:

> This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Mandan, Hidatsa and Arikara Nation, federally recognized as the Three Affiliated Tribes of the Fort Berthold Reservation ("MHA Nation"). . . . By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the tribal courts of the MHA Nation, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

 (Oct. 21, 2016 Loan Agreement, attached as Ex. 1 at 1).

66.     Similarly, the Loan Agreement Defendants provided to Mr. Inscho disclaims the laws of all other jurisdictions other than the MHA Nation's laws, stating:

> The laws of the Mandan, Hidatsa and Arikara Nation [sic] the Three Affiliated Tribes of the Fort Berthold Reservation govern this Loan Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

(June 30, 2016 Loan Agreement, attached as Ex. 2 at 1).

67.     The Fourth Circuit has already ruled that such a disclaimer of all federal and state law renders an agreement's choice-of-law and arbitration provisions unconscionable and unenforceable. *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 2017 WL 1903475, at *4 (4th Cir. 2017). .

68.     In finding a nearly identical provisions unenforceable in *Hayes*, the Fourth Circuit explained, "We recognize that the FAA establishes a 'liberal policy favoring arbitration agreements.' But rather than use arbitration as a just and efficient means of dispute resolution, [the

defendant] seeks to deploy it to avoid state and federal law and to game the entire system." *Hayes*, 811 F.3d at 676 (citations omitted).

69.     In recently reaffirming the *Hayes* decision, the Fourth Circuit held that a choice of law and arbitration provision similar to the provisions used by Defendants were "not distinguishable in substance from the related provisions" in *Hayes*, and the Fourth Circuit concluded that the agreement was "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." *Dillon*, 2017 WL 1903475, at *4.

70.     Accordingly, Plaintiffs request the Court to enter a declaratory judgment that the governing law, forum selection, and arbitration provisions are unenforceable as to Virginia consumers.

71.     Plaintiffs further request the Court to enter an injunction prohibiting Defendants from collecting any amounts from Virginia consumers in connection with the loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and deleting any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## COUNT ONE:
## DECLARATORY JUDGMENT
## (CLASS CLAIM)

72.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

73.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class and subclass initially defined as follows:

**Declaratory Judgment Class**: All persons who: (1) received a loan with any of Defendants' Payday Lending Websites (2) when they resided or were located in Virginia, (3) which contained an interest rate greater than 12%.

**Declaratory Judgment Subclass**: All persons who: (1) received a loan with any of Defendants' Payday Lending Websites (2) when they resided or were located in

Virginia, (3) which contained a choice-of-law provision, arbitration provision, or forum selection clause similar or identical to Plaintiffs.

Plaintiffs are members of the Declaratory Judgment Class and Subclass.

74.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

75.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void under Va. Code. § 6.2-1541(A) and (2) whether the loan agreements are void as a matter of public policy.

76.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

77.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

78.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

79.    Virginia law provides that the "loan contract shall be void" if it contains an interest rate above 12% and the company makes a loan without a consumer finance license. Va. Code. § 6.2-1541(A) (emphasis added).

80.    Defendants' loan agreements violated § 6.2-1541(A), and, thus, Plaintiffs seek a judgment declaring that the loan agreements are void and unenforceable.

81.    Defendants' loan agreements not only violate Virginia's usury statutes and public policy, but they also contain unconscionable choice of law, forum-selection, and arbitration provisions that are void and unenforceable for public policy concerns.

82.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law, forum-selection, and arbitration provisions.

83.     Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

84.     Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully move for entry of a declaratory judgment that the loan agreements are void and unenforceable pursuant to § 6.2-1541(A). In the alternative, Plaintiffs seek a declaratory judgment that the choice of law, forum-selection, and arbitration provisions are void and unenforceable as a matter of public policy.

### COUNT TWO:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

85.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

86.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

> All Virginia residents who executed a loan with any of Defendants' Payday Lending Websites where the loan was originated and/or any payment was made on or after May 29, 2013.

Plaintiffs are members of the Virginia RICO Class.

87.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

88.     **Predominance of Common Questions of Law and Fact.** **Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These common questions
predominate over the questions affecting only individual class members. The common questions
include: (1) whether the Enterprise constitutes an "enterprise" under RICO; (2) whether Johnson,
Chewning, and Cane Bay Partners participated in the Enterprise; (3) whether the loans violated
Va. Code § 6.2-1501 because the interest rates were too high; and (4) what is the proper recovery
for Plaintiffs and the class members against each of the Defendants.

89.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member. Plaintiffs are entitled to relief under the same causes of action as the
other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts
and legal theories as each of the class members.

90.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the members of the class that they seek to represent. Plaintiffs have retained
counsel competent and experienced in such litigation, and they intend to continue to prosecute the
action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the
members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them
to not vigorously pursue this action.

91.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the
class members predominate over questions affecting only individual members, and a class action
is superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

92.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of any entity associated with the Enterprise.

93.    As alleged above, Defendants violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

94.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

95.    All of the loans made to Virginia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Virginia.

96.     Johnson and Chewning, during the pertinent times, were directly and materially involved in this intentional misconduct and knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Cane Bay Partners.

97.     This conduct began sometime as early as 2009, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

98.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, including any interest, fees, or other sums collected by Defendants.

## COUNT THREE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

99.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

100.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with any of Defendants' Payday Lending Websites where the loan was originated and/or any payment was made on or after May 29, 2013.

101.     **Numerosity. Fed. R. Civ P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

102.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

103.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

104.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

105.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of each entity that has engaged in the Enterprise.

106.   As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), including the agreement between Defendants and the MHA Nation that established the terms and operations of the rent-a-tribe business described herein.

107.    As a result of Defendants' participation in the Enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FOUR:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

108.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

109.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**Virginia Usury Class**: All Virginia residents who executed a loan with any of Defendants' Payday Lending Websites where any interest was paid.

**Virginia Usury Subclass**: All Virginia residents who executed a loan with with any of Defendants' Payday Lending Websites where any interest was paid on or after May 17, 2015.

110.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

111.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG,

Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt ) https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).[10]

112.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants violated Virginia Code Section § 6.2-1501 because their interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

113.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

---

[10] *See also* News Release, Attorney Gen. Pam Bondi, Fl., Attorney General Bondi and OFR Reach Multimillion Dollar Settlements with Online Lender (Jan. 12, 2017), http://myfloridalegal.com/__8525622-20065EE67.nsf/0/2F836464563D0EB5852580A600709370?Open&Highlight=0,western,sky ($11 million in compensation, $15 million in loan forgiveness, $500,000 civil penalty, $500,000 administrative fine, and $250,000 for costs); *Internet Lender CashCall, Inc. Barred from Doing Business in Minnesota*, Minn. Att'y Gen. Lori Swanson, https://www.ag.state.mn.us/Office/PressRelease/20160819InternetLender.asp (last visited May 24, 2017) ($11.7 million in monetary relief including a $4.5 million restitution fund).

114.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

115.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

116.    All of the loans made by Defendants to Virginia consumers used an interest rate greater than 12% and none of the exceptions to Va. Code § 6.2-303 apply.

117.    Accordingly, Plaintiffs and the class Members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the

amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305(A).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.      Certification of this matter to proceed as a class action;

B.      Declaratory, injunctive, and damages relief as pled herein;

C.      Attorney's fees, litigation expenses, and costs of suit; and

D.      Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PATRICK INSCHO, STEVEN PIKE
DONNA FIRKIN, DIANNE TURNER, and
LORETTA BRICKEY,** *on behalf of themselves
and all individuals similarly situated***,**

By:      */s/ Andrew Guzzo*
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Kelly & Crandall, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7570
Fax: (703) 591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Jeffrey Kaliel
Andrew Silver
Tycko & Zavareei LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 973-0900
(202) 973-0950 Facsimile
*jkaliel@tzlegal.com*
*asilver@tzlegal.com*
*Counsel for Plaintiffs*